THE LIPPINCOTT DISTRIBUTING CO., APPELLEE, *v.* THE PEOPLES COMMERCIAL & SAVINGS BANK, APPELLANT, ET AL.

(Decided February 12, 1940.)

*Messrs. Black, McCuskey, Ruff & Souers, Mr. Donald K. Merwin* and *Mr. Richard O. McCuskey,* for appellee.

*Mr. Joseph W. Kennedy* and *Mr. Henry W. Kattman,* for appellant.

SHERICK, P. J.   This is an appeal on questions of law and has to do with the validity or invalidity of warehouse receipts.   The action is in replevin in which damages are sought.   The facts are as follows:

The Lippincott Distributing Company contracted in writing with the Union Grocers, Inc., to sell and deliver groceries to it upon consignment.   Lippincott company retained title to the goods, but Union Grocers, Inc., was clothed with the indicia of ownership, and was permitted to wholesale these goods and receive payment therefor and to remit to Lippincott company as upon an open running account.   Shipments and sales were frequent.   Union Grocers, Inc., being in need of money, its officers caused to be created the Union Commercial Warehouse Company, which occupied the same building with Union Grocers, Inc., and whose officers were interlocking.   Union Grocers, Inc., upon receipt of shipments deposited them with the warehouse company, which issued negotiable warehouse receipts thereon to the order of Union Grocers, Inc.   These receipts speci-

fied coverage of certain lot numbers of so many cases of canned goods of a certain value. Each receipt is made to show a total value.

Union Grocers, Inc., without the knowledge or permission of the Lippincott company, endorsed these receipts and procured from the defendant bank, advances thereon at a 20 to 25 per cent margin. These loans were evidenced by notes and the warehouse receipts were pledged as security. The practice was that, if Union Grocers, Inc., desired to sell certain pledged merchandise, new receipts were tendered in pledge as security and the desired receipts surrendered by the bank to it. This practice continued for about a year.

On April 30, 1936, the bank held four notes against Union Grocers, Inc., and as security therefor it held certain warehouse receipts. The notes aggregated $28,250. The receipts held represented a total value of $42,000. The notes were due and unpaid. As of that date a renewal note for a like sum, due May 25th next, was made and delivered to the bank, to secure which, warehouse receipts of the total value of $35,000 were pledged. Before due date, Union Grocers, Inc., was pressed by Lippincott company, whereupon the bank presented its warehouse receipts to the warehouse company and secured possession of the remaining deposited goods which were covered by the pledged receipts which it held. The bank sold the merchandise recaptured for the sum of $1456. It is the value of these goods that Lippincott company now seeks to recover. Lippincott company prevailed in the trial court and obtained a verdict for $1734.30, upon which judgment was entered and from which the bank appeals. The principal claim of error is that the verdict and judgment are contrary to law.

It is averred and established that the bank, up to the time of the consignor's appearance pressing settlement with Union Grocers, Inc., early in May 1936, had no knowledge of Union Grocers, Inc., lack of title or that

Lippincott company retained ownership of the goods. It, the bank, at all times acted "in good faith" and parted with something of "value" when it took notes and received warehouse receipts in pledge as herein previously recited. The bank acted honestly throughout its entire dealing with Union Grocers, Inc., even if it were careless and negligent.

The case was tried in the Common Pleas Court upon the theory that the plaintiff might recover if it proved title to the goods sold to Union Grocers, Inc., and identified, as its own, the goods sold by the bank (this was said to make a *prima facie* case) and that before the defendant could prevail it must prove that the warehouse receipts were not received by it as security for an antecedent debt. The legal phase of the case was prompted by Sections 8360 and 8361, General Code, which appear under title, "Liens," sub-title, "warehousemen," Sections 8358 to 8364, inclusive, General Code. Sections 8360 and 8361, General Code, are parts of an act "to prevent fraudulent practices," passed in 1844 (42 Ohio Laws, 49). They are, in part, adopted from the English Factors Act. They now stand unchanged. Unquestionably, the case of *Cleveland, Brown & Co.* v. *Shoeman,* 40 Ohio St., 176, which considers these sections, then standing uncurtailed, played an important part in the shaping of the issues at trial.

The Act of 1844 not only had to do with warehousemen and their receipts, but it covered factors and their agents and private acceptors of goods, common carriers and owners of water craft. It is concerned with bills of lading, custom-house permits and other documents evidencing title, ownership and security. It is apparent that the act had a general scope and purpose, and an intent to accomplish that which its title indicates. We make these observations, which will hereinafter be further extended, for the reason that we entertain a theory for the solution of the question before us which has not been advanced by the record

or by counsel, and which deletes from the controversy any question of antecedent debt or substitution of warehouse receipts.

In 1908, the Legislature of this state passed an act "to establish a law uniform with the laws of other states on warehouse receipts." (99 Ohio Laws, 400.) It now appears as Sections 8457 to 8509, inclusive, General Code. The act has now been adopted with slight modification in 45 states. This act effects certain changes which we propose to point out.

The act of 1908, special in its character, has little or no effect upon the general purpose of Section 8360, General Code, which deals with "in what cases factor or agent deemed true owner," that is, as it related to the facts of this case. But the purpose of Section 8361, General Code, has thereby suffered material alteration. Section 8361 is as follows:

"Every person who accepts any such merchandise on deposit from any such agent, as security for any antecedent debt or demand, shall not thereby acquire or enforce any right or interest in or to such merchandise or document, other than was possessed or might have been enforced by such agent, at the time of such deposit."

It is therefore apparent that in 1844 the Legislature deemed it wise to place a limitation upon negotiation of a warehouse receipt by an agent, which receipt otherwise might be negotiable and travel free of any equities. In 1908, the Legislature apparently had a different thought, because Sections 47, 49 and 58 of the Warehouse Receipts Act, now Sections 8503, 8505 and 8508, General Code, prescribe contrary provisions upon the same subject, which emasculate Section 8361, General Code insofar as it embraces warehouse receipts. These sections read:

"Sec. 8503. The validity of the negotiation of a receipt is not impaired by the fact that such negotiation was a breach of duty on the part of [Union Grocers,

Inc.] the person making the negotiation, * * * if the person to whom the receipt was subsequently negotiated [the bank], *paid value therefor in good faith, without notice of the breach of duty, or* loss, theft, *fraud,* accident, mistake, duress *or conversion* [by Union Grocers, Inc.]." (Italics ours.)

"Sec. 8505. When a negotiable receipt has been issued for goods, no seller's [Lippincott company's] lien or right of stoppage *in transitu* shall defeat the rights of any *purchaser* [the bank] *for value in good faith* to whom [the bank] such receipt has been negotiated, whether such negotiations be prior or subsequent to the notification to the warehouseman who issued such receipt of the seller's claim to a lien or right of stoppage *in transitu.* Nor shall the warehouseman be obliged to deliver or justified in delivering the goods to an unpaid seller unless the receipt is first surrendered for cancellation." (Italics ours.)

From these two sections it is clear that the rights and obligation of the seller, the purchaser and the warehouseman are fixed with reference to goods upon which a warehouse receipt has been issued and is found in the possession of a purchaser for value in good faith.

The terms employed in these two sections need definition. The Legislature took care of this matter in Section 8508, General Code. Therein the following are defined:

" 'Receipt' means a warehouse receipt."

" 'Purchaser' includes mortgagee and pledgee."

" 'Value' is any consideration sufficient to support a simple contract. An *antecedent or preexisting obligation, whether for money or not, constitutes value where a receipt is taken either in satisfaction thereof or as security therefor.*" (Italics ours.)

"*A thing is done 'in good faith'* within the meaning of this chapter, *when it is in fact done honestly, whether it be done negligently or not.*" (Italics ours.)

Clearly these provisions of the Uniform Warehouse

Receipts Act are in conflict with Section 8361, General Code, which is part of an act covering a general subject. The Uniform Warehouse Receipts Act is exclusively a special act upon a particular subject. It is subsequent in time of enactment. Both treat of the same subject. It is manifest that the sections are irreconcilable and cannot be harmonized on a question of negotiability of warehouse receipts. The legal maxim that the rule of repeal by implication is not favored, must in this case give way to the equally well known exception thereto, which should require no further restatement, other than to direct attention to the case of *Richards* v. *Market Exchange Bank,* 81 Ohio St., 348, 90 N. E., 1000, wherein Section 5833, Revised Statutes, now Section 12191, General Code, which provides for release of sureties, was found in conflict with and subservient to certain provisions of the Uniform Negotiable Instruments Act.

A word about the Legislature's intention. Surely it was proposed to make warehouse receipts to all intent and purpose as negotiable as bills and notes, which may be drawn and negotiated upon an antecedent debt, which is a valid consideration to support the promise. The Legislature went so far as to say that if the pledge be "honestly" made, it is done "in good faith."

Lippincott company made the situation possible. It clothed its agent with possession and indicia of ownership. The bank parted with "value." It was without knowledge of the consignor's retained title. It took the agent's warehouse receipts in pledge, "honestly" and "in good faith." It, the bank, secured the receipts in pledge, free of any equities existing in favor of the consignor as against its consignee. The parallel between this transaction and a negotiation of negotiable paper should be and is self-evident. This is what the Legislature intended to accomplish. To approve of the conclusion reached by the trial court is to limit

and nullify the Uniform Warehouse Receipts Act and the ends sought to be accomplished.

The appellee's claim of irregularity in the organization of the Union Commercial Warehouse Company by the officers of Union Grocers, Inc., cannot change the rule applicable, even if it was a scheme by the agent to defraud its principal. Section 8508, General Code, says that a " 'warehouseman' means a person lawfully engaged in the business of storing goods for profit." It appears that the warehouse company was duly incorporated and was lawfully operating. The receipts issued complied with statutory requirements. Again it must be said that plaintiff made the situation possible. If its agent committed a fraud or converted its goods to the use of Union Grocers, Inc., and thereby deprived the owner of its goods by depositing them in a warehouse and negotiating the receipt therefor, then the answer is that Section 8503, General Code, will adequately cope with such a situation.

The judgment of the trial court, being contrary to law, must be and is reversed and final judgment is entered in favor of the bank.

*Judgment reversed and final judgment for appellant.*

LEMERT and MONTGOMERY, JJ., concur.